Appeal of WINIFREDE COAL COMPANY,     Docket No. 311. ET AL.[1]

1. Amounts paid for the purchase and installation in a mine of electric motors, storage batteries and accessories, mining machines, and a track scale, having a useful life of a number of years are not ordinary and necessary expenses deductible from gross income in income-tax returns.

2. The evidence presented does not warrant the allowance of a greater amount for depreciation and depletion for the year 1920 than has been allowed by the Commissioner.

3. The evidence presented does not indicate any such abnormality of invested capital or of income for the year 1920 as would warrant assessment under section 328 of the Revenue Act of 1918.

Submitted January 13, 1925; decided February 10, 1925.

*Morris D. Kopple, Esq.*, for the taxpayer.

*A. Calder Mackay, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before GRAUPNER, LANSDON, LITTLETON, and SMITH.

This appeal came on for hearing January 8, 1925, upon a determination by the Commissioner of a deficiency in income and profits taxes for the calendar year 1920 in the amount of $80,036.13. From the documentary and oral evidence introduced the Board makes the following

FINDINGS OF FACT.

1. The Winifrede Coal Company, the Winifrede Railroad Company, and the Belmont Coal Company are all West Virginia corporations, with principal office in Cincinnati, Ohio. For the year 1920 these corporations were affiliated within the purview of section 240 of the Revenue Act of 1918 and filed a single consolidated return.

---

[1] The following affiliated corporations are parties to this appeal: Winifrede Railroad Company; Belmont Coal Company.

2. A deficiency letter was mailed to the taxpayers on August 6, 1924, which showed a deficiency in income and profits taxes assessed for the calendar year 1920 in the amount of $80,036.16.

3. In the calendar year 1920 the Winifrede Coal Company made the following expenditures for items of equipment and plant:

| | |
|---|---:|
| 1 10-ton electric locomotive | $6, 682. 00 |
| 5 5-ton electric locomotives | 31, 250. 00 |
| 3 electric mine locomotives | 20, 190. 00 |
| 1 storage battery | 3, 177. 25 |
| 1 track scale | 6, 000. 00 |
| 5 mining engines | 21, 000. 00 |
| | 88, 299. 25 |

During the same calendar year the Belmont Coal Company made the following expenditures for items of equipment and plant:

| | |
|---|---:|
| 2 mining engines | $8, 250. 00 |
| 1 6-ton locomotive | 4, 712. 00 |
| | 12, 962. 00 |

In the consolidated return filed for 1920, the total cost of these additions to equipment and plant aggregating $101,261.25 was deducted from gross income as an ordinary and necessary expense of carrying on business. The Commissioner has disallowed this deduction on the ground that it was not an operating expense.

The equipment thus purchased had a useful life of a number of years and much of it is still in use. The mining machines replaced worn out or obsolete machines. The locomotives were purchased to be used in hauling mine cars which had theretofore been hauled principally by mules. The electric haulage brought about through the acquisition of this equipment enabled the taxpayers to operate their mines at capacity with smaller forces of men and with fewer mules than formerly.

4. The number of short tons of coal produced by the Winifrede Coal Company and the Belmont Coal Company for the years 1915 to 1920, inclusive, is shown by the following tabulation:

| Year | Winifrede | Belmont |
|---|---|---|
| 1915 | 130, 384 | 80, 981 |
| 1916 | 290, 131 | 126, 560 |
| 1917 | 273, 957 | 104, 054 |
| 1918 | 201, 916 | 77, 928 |
| 1919 | 146, 686 | 34, 836 |
| 1920 | 197, 425 | 75, 481 |

5. On or about July 30, 1881, Theodore Wright purchased at a judicial sale approximately 11,000 acres of coal lands in the Kanawha coal fields of West Virginia, which lands were taken over by the Winifrede Coal Company. This property is located at Fields Creek, in Kanawha County, W. Va., about 7 miles from the Chesapeake and Ohio Railroad and the Kanawha River.

Upon such information as was furnished the Commissioner with respect to the quantity of coal in place and the value thereof at March 1, 1913, the Commissioner determined the amount to be 28,600 tons and the value in place 3 cents per ton. The taxpayer has

placed in evidence no data relative to the amount of coal in place at the basic date.

In its return for the year 1917 the taxpayer claimed the deduction from gross income of an amount representing depletion at the rate of 10 cents per ton of coal mined. This depletion rate was reduced by the Commissioner to 3 cents a ton and depletion at that rate has been allowed for the years 1919 and 1920.

From 1901 to 1911 the prevailing royalty paid under leases entered into during that period for the privilege of mining coal in the Kanawha fields was from 6 cents to 8 cents per ton.

6. On or about November 1, 1906, the Winifrede Coal Company purchased the entire capital stock of the Belmont Coal Company of a par value of $50,000 for the sum of $150,000 and has since held that stock.

The Belmont Coal Company operated under a lease certain coal mines located about 10 miles northeast of the Winifrede mines, which lease expired by its terms January 1, 1922, and which provided for royalty payments which averaged 6¼ cents a ton.

In his first amendment of the 1919 and 1920 returns of the Belmont Coal Company the Commissioner disallowed the deduction of any amount for depletion. Subsequently, depletion was allowed at the rate of 1 cent per ton and the amount allowed as a deduction from gross income for the year 1920 was $712.24.

7. In the consolidated returns filed for the years 1919 and 1920 the taxpayers claimed as deductions from gross income $10,000 for each year for depreciation of the depreciable properties owned by the Belmont Coal Company. Of the amount claimed for 1919, $4,107.08 was disallowed by the Commissioner; of the amount claimed for the year 1920, $4,173.75 was first disallowed and then, by a subsequent adjustment, only $2,875.39 was disallowed.

8. The taxpayers sustained a net loss for the years 1918 and 1919, and the net income for the year 1920 was reduced by the net loss for the year 1919 under the provisions of section 204 of the Revenue Act of 1918.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

SMITH: In their petition the taxpayers allege that in the deficiency letter sent to them by the Commissioner under date of August 6, 1924, showing a deficiency in income and profits taxes for 1920 of $80,036.16, the following errors prejudicial to them were made:

(1) Disallowance as deduction from gross income of expenditures made during the year 1920 in accordance with article 222 of Regulations 45.

(2) Failure to allow as a deduction from gross income proper depletion on account of coal removed from land owned in fee by the Winifrede Coal Company.

(3) Failure to allow as a deduction from gross income proper depletion on account of coal removed from land in which the Belmont Coal Company had an equity as the lessee.

(4) Failure to allow as a deduction from gross income proper depreciation on capital assets acquired from the Belmont Coal Company.

(5) Failure to allow consideration under sections 327 and 328 of the Revenue Act of 1918.

The allegations of error on the part of the taxpayers will be considered in order.

1. At the hearing of this appeal it was contended in behalf of the taxpayers that they were induced to purchase large amounts of equipment during the year 1920 by a regulation of the Commissioner known as article 222 of Regulations 45. The regulation provided as follows:

ART. 222. *Allowable capital additions in case of mines.*—(a) All expenditures for development, rent, and royalty in excess of receipts from minerals sold shall be charged to capital account recoverable through depletion, while the mine is in the development stage. Thereafter any development which adds value to the mineral deposit beyond the current year shall be carried as a deferred charge and apportioned and deducted as operating expense in the years to which it is applicable.

(b) All expenditures for plant and equipment shall be charged to capital account recoverable through depreciation, while the mine is in the development stage. Thereafter the cost of major items of plant and equipment shall be capitalized, but the cost of minor items of equipment and plant, *necessary to maintain the normal output*, and the cost of replacement may be charged to current expense of operation. (Italics ours.)

The additions to plant and equipment made during the year 1920 and charged as an expense included the following:

| | |
|---|---:|
| 1 10-ton electric locomotive | $6, 682. 00 |
| 5 5-ton electric locomotives | 31, 250. 00 |
| 3 electric mine locomotives | 20, 190. 00 |
| 1 storage battery | 3, 177. 25 |
| 1 track scale | 6, 000. 00 |
| 5 mining engines | 21, 000. 00 |
| 2 mining engines | 8, 250. 00 |
| 1 6-ton locomotive | 4, 712. 00 |
| | 101, 261. 25 |

The taxpayers also expended considerable amounts for rails, copper wire, pumps, etc., which were allowed as expense deductions by the Commissioner.

Upon the argument of this appeal it was strongly contended that the items of equipment and plant acquired with the $101,261.25 only had the effect of keeping up the normal output of the mines; that the production of the mines was not increased thereby; that unless these expenditures had been made the companies would not have been able to operate successfully in subsequent years and that they would long ago have gone into bankruptcy. It was not denied that the companies were able to operate more effectively after they had acquired and installed the equipment and that by electric haulage they were enabled to operate their mines with smaller forces of men and with a lessened number of mules.

The Revenue Act of 1918 permits a corporation taxpayer to deduct from gross income " all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." (Section 234 (a) (1).)

Section 235 provides "that in computing net income no deduction shall in any case be allowed in respect of any of the items specified in section 215."

Section 215 provides:

That in computing net income, no deduction shall in any case be allowed in respect of—

*     *     *     *     *     *     *

(b) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate;

(c) Any amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made; * * *

The sole reliance of the taxpayers in their contentions that the $101,261.25 in question is deductible from gross income is article 222 of Regulations 45, above quoted. It is contended that under the conditions which obtained in the Kanawha field the addition of the equipment purchased with the amount in question was "necessary to maintain the normal output" of the mine.

From a careful consideration of the entire evidence before us we can not doubt that the electric locomotives, mining machines, the track scale, etc., purchased with the $101,261.25 were improvements. They had a useful life of many years and many of them are still in use. The amounts paid for them did not constitute ordinary and necessary expenses. The expenditures were very unusual. In fact, one witness testified that similar items had never before been purchased. The Board does not conceive that article 222 of Regulations 45 was ever intended to classify items of equipment and plant of a kind made by the taxpayers as expenses. Indeed, the Commissioner has not so interpreted the article. If it were to be so interpreted we should have to hold that it is invalid and is beyond the scope of the power of the Commissioner to make regulations.

2. The Commissioner has allowed the Winifrede Coal Company depletion for the years 1919 and 1920 at the rate of 3 cents per ton of coal mined. The taxpayer contends that depletion should have been allowed at the rate of from 5 to 10 cents per ton. The taxpayer has placed in evidence no data which would enable the Board to arrive at the tonnage of the coal in place at March 1, 1913, with the exception of certain information filed by it in connection with a claim for the abatement of an additional tax assessed against the taxpayer for the year 1917. For the purpose of the claim the taxpayer contended that the amount of coal in place at March 1, 1913, was 10,000,000 tons and that the value of the coal in place was $1,000,000. It therefore claimed a depletion unit of 10 cents per ton.

At the oral hearing of this case the taxpayer did not press its claim relative to the tonnage at March 1, 1913, being only 10,000,000, but placed on the witness stand an expert mining engineer who had not made an examination of the properties but testified that if the basis of 28,600 recoverable tons was to be used, a depletion unit of 5 cents per ton should in his opinion be employed to compute the allowable deduction for depletion.

Counsel for the Commissioner at the hearing placed upon the witness stand an engineer who was thoroughly conversant with the

conditions in the Kanawha coal field of West Virginia, and who made the computations upon which the amount of allowable depletion for the years 1919 and 1920 was made. This engineer testified in part as follows:

* * * I might say * that when I considered the royalty rate of 10 cents for this property at 1913, I was well aware that I was high enough, and that they could not substantiate a 10-cent royalty in that immediate field both before 1913, and after 1913. The property on the right-hand side of them is 8 cents, and across the river it is 6 cents, and the one that they purchased the stock of was 6 and a fraction cents. Now, with regard to the royalty question, this company seems to be like a great many other companies, and a great many people on that very question, when coal is worth 10 cents or 8 cents a ton royalty every ton of coal in the ground is worth 8 or 10 cents a ton. Now, if I understand the Department's methods correctly, if all of the coal in the ground could be automatically gotten up with steam shovels, I think for instance if A leases property from B for 10 cents a ton spread over the life of the property for a number of years, payable at 10 cents a ton, if by some favorable circumstance, you would mine it all, and lay it on top of the ground, A would have to pay B 10 cents a ton, but that does not happen. Therefore, the Government method * * * is the right method, is to take the value of the coal in the ground as 10 cents a ton, at the present value, just like notes in other words, so much coal out the first year, and so much the second year, and the third year, and the fourth year and so on. Therefore, the method that I have used here was to take the 10 cents, and use forty years of life, and that is on basis that this property could be mined out in forty years, which is extremely favorable, for it can not be mined out in twice that time, and therefore when I take this method, and allow this company 3 cents a ton, I allowed them 10 cents a ton on a forty-year life, and I accepted all of the tonnage in bulk for depletion purposes. * * *

Upon the evidence before us, we are of the opinion that the amount of depletion allowed by the Government, namely, 3 cents per ton of coal mined, has not been proven to be incorrect or unjust to the taxpayer. The claim of the taxpayer upon this point must, therefore, be denied.

3. The Belmont Coal Company has been allowed depletion at the rate of 1 cent per ton for the years 1919 and 1920. It contends that this is insufficient to return to it the value of its lease at March 1, 1913. No evidence as to the value of the lease at that date is before us. In 1906 the Winifrede Coal Company purchased the capital stock of the Belmont Coal Company, which was $50,000, for $150,000 cash. It is assumed by counsel for the taxpayers that the premium paid upon the capital stock was in reality a premium for the lease which the Belmont Coal Company owned and which expired January 1, 1922.

We can not indulge the assumption of the taxpayer that the value of its lease at March 1, 1913, was $100,000. In the absence of evidence as to that value we can not make any finding other than that the determination of the Commissioner that the depletion at the rate of 1 cent per ton will return to it the value of its lease at March 1, 1913, is correct. The claim of the taxpayer for a larger depletion deduction must be denied for lack of evidence.

4. The fourth contention is that the Commissioner has failed to allow as a deduction from gross income proper depreciation on capital assets acquired from the Belmont Coal Company. For each of the years 1919 and 1920 there was deducted from the gross income shown in the consolidated return $10,000 for depreciation. The amounts allowed by the Commissioner for the years 1919 and

1920 are $5,892.92 and $7,125.01, respectively. The Commissioner found the value of the depreciable property at December 31, 1919, to be $86,260.81. The company has been allowed invested capital for the year 1920 based upon such value of improvements. The gist of the taxpayer's claim upon this point appears to be that inasmuch as the lease expired at January 1, 1922, a sufficient amount should be allowed for depreciation to amortize the value of such improvements at the date of the expiration of the lease.

It is contended that the original investment of the Winifrede Coal Company in the stock of the Belmont Coal Company was $150,000; that at that time the tangible assets of the Belmont Coal Company were $50,000; that from November 1, 1906, to December 31, 1916, the company spent $76,611.04 for improvements of which amount only $22,712.84 was charged to expense; that the additions to the plant account capitalized for the period 1907 to 1919 was $53,908.20; and that the value of the improvements at December 31, 1919, was fully the amount found by the revenue agent, namely, $86,260.81.

The evidence upon this point is inconclusive. It does not show the value of depreciable properties which the company could remove from the leased premises in case the lease was not renewed at January 1, 1922, nor does it show whether the lease was renewed and whether the company continued in business after January 1, 1922. The appeal of the taxpayer upon this point is denied for lack of evidence.

5. The taxpayers contend that they are entitled to consideration and relief under section 328 of the Revenue Act of 1918 from the proposed tax liability for the year 1920. This claim is predicated upon an allegation that the taxpayers' invested capital for the years 1919 and 1920 can not be satisfactorily ascertained by reason of imperfect bookkeeping records during the early years of operation. The claim is also predicated upon the allegation that the salaries paid to officers for the year 1920 were abnormally low, considering the extraordinary results achieved in that year. The president was paid a salary of $23,000 and the secretary and treasurer a salary of $16,500. It is also claimed that the net income for 1920 was wholly out of proportion to the invested capital and that there was a disproportion between the gross profits and the gross sales.

In the opinion of the Board the evidence does not prove that the invested capital of the corporations can not be accurately ascertained. The books of account apparently reflect the true invested capital. The Board has not been furnished any evidence which would warrant it in reaching a conclusion that the income for 1920 was overstated by reason of the payment of the salaries specified to the president and the secretary and treasurer. If the salaries paid were abnormally low it has not been shown what normal salaries are. The evidence presented does not disclose any such abnormality of invested capital or income as would warrant consideration under the relief provisions of the law. The contention of the taxpayer upon this point is therefore disallowed.